UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| ARIEL MOLINA-RUIZ,<br><br>Plaintiff,<br><br>v.<br><br>CORIZON HEALTH SERVICES; IDAHO DEPARTMENT OF CORRECTION; GRANT ROBERTS; AND SAMUEL PIERSON,<br><br>Defendants. | Case No. 1:17-cv-00172-BLW<br><br>**MEMORANDUM DECISION AND ORDER** |

## INTRODUCTION

Before the Court is Defendants Samuel Pierson and Grant Roberts' Motion for Summary Judgment. Dkt. 22. The motion is fully briefed and at issue. For the reasons explained below, the Court will grant Defendants' motion.

## FACTS[1]

Mr. Molina is currently an inmate in the custody of the Idaho State Correctional Center ("ISSC"). On April 19, 2017 Mr. Molina filed a complaint alleging, *inter alia*, that

---

[1] The facts reported in this section are drawn from Defendants' Statement of Undisputed Material Facts. *See* Dkt. 22-2, at 1-7. Plaintiff has not refuted or otherwise addressed the vast majority of these factual statements. The Court thus considers these unrefuted facts set forth in Defendants' statements as undisputed for purposes of the pending motion. *See* Fed.R.Civ.P. 56(e)(2) ("[i]f a party fails to ... properly address another party's assertion of fact ... the court may ... consider the fact undisputed for purposes of the motion"); *Heinemann v. Satterberg*, 731 F.3d 914, 917 (9th Cir. 2013).

Mr. Roberts and Mr. Pierson interfered with or otherwise delayed physician-recommended cataract eye surgery, which caused him to suffer harm and temporarily lose vision in his right eye. *See* Dkt. 24. In their motion for summary judgment, Defendants argue that there is no evidence to support Mr. Molina's allegations. Dkt. 22-1 at 10.

On February 28, 2017, Mr. Molina first started complaining of vision loss in his right eye. Dkt. 22-2 at ¶ 1. Three days later, he was evaluated by a nurse, who referred Mr. Molina to a health care provider to assess the problem. *Id.* at ¶ 1-2. Within a week, Mr. Molina was sent to an emergency room and was diagnosed with a tentative retinal problem. *Id.* Two days later, Mr. Molina went to an off-site ophthalmologist, Dr. Scott Simpson, who specializes in retinal issues. *Id.* Dr. Simpson diagnosed a cataract in Mr. Molina's right eye, and indicated that "[t]there would be no contraindications to proceed with cataract extraction from a retinal standpoint." *Id.* Mr. Molina was then scheduled for a follow-up visit with a health care provider to discuss Dr. Simpson's diagnosis and next steps. *Id.* at ¶ 4. But Mr. Molina failed to attend his follow-up appointment with his provider on March 20, 2017, and again when it was rescheduled on April 13, 2017. *Id.*

On March 24, 2017, Mr. Molina submitted his first official grievance regarding his vision, complaining that he had not received proper treatment. *Id.* at ¶ 5. Prior to their review of Mr. Molina's grievances, neither Defendant had any knowledge of Plaintiff's medical problems. *Id.* Defendant Pierson responded first to this grievance as a "first level responder," and reviewed Plaintiff's then-existing medical records. *Id.* Defendant Roberts

did the same as a "second level responder." *Id.* On April 5, 2017, both Defendants denied Mr. Molina's grievance, suggesting that Mr. Molina follow-up with his providers regarding next steps. *Id.*; *see also* Dkt. 22-4 at 2-3.

On April 10, 2017, Mr. Molina appealed Defendants' decisions. *Id.* In his appeal Mr. Molina insisted that the "off-sight [sic] provider [Dr. Simpson]" had recommended surgery; that his right "eye ha[d] gotten worst [sic]"; and that he "can't see at all" out of that eye. Dkt. 22-4 at 3. Mr. Roberts then discussed the grievance appeal with Rona Siegert, the Health Services Director at ISCC. Dkt. 22-2 at ¶ 6. The two agreed that, though Dr. Simpson had not clearly recommended cataract surgery, and though Molina had repeatedly failed to meet with his providers to discuss next steps, it was appropriate to seek approval for the removal of the cataract in Plaintiff's right eye. *Id.*

On April 27, 2017, Ms. Siegert responded to Mr. Molina's appeal. *Id.* at ¶ 6. Ms. Siegert explained that Dr. Simpson had diagnosed Mr. Molina with "a cataract in [his] right eye and a cataract extraction was recommended." Dkt. 22-4; Dkt. 24 at 1-2. Ms. Siegert also explained that "facility medical staff had scheduled Molina three times for an off-site follow up appointment to discuss a treatment plan," and that each time Mr. Molina left before being seen. Dkt. 22-4. Ms. Siegert reminded Mr. Molina to "stay for [his] appointments so the provider can discuss the specialist's recommendation and further treatment." *Id.* Ms. Siegert also stated that a consultation had been requested on April 25, 2017. *Id.* at ¶ 6.

Because Dr. Simpson is a retina specialist who does not perform cataract extraction surgeries, it was necessary to locate another provider to evaluate Plaintiff and perform this procedure. *Id.* at ¶ 7. Mr. Molina was scheduled to see ophthalmologist Dr. Lawrence Anderson on August 14, 2017, which was Dr. Anderson's first available appointment. *Id.*

On June 6, 2017, Mr. Molina submitted his second grievance complaining that he still had not yet had surgery on his right eye. *Id.* at ¶ 8. As a first-level responder, Mr. Pierson again reiterated that Mr. Molina needed to attend his appointments with providers to discuss his condition, and emphasized that Dr. Simpson had not recommended a cataract extraction procedure. *Id.* Nevertheless, Mr. Pierson responded to Mr. Molina that an appointment with an ophthalmologist had been scheduled. *Id.* As the second level responder, Mr. Roberts stated that Mr. Molina was scheduled to be seen and, while "[w]e try to schedule appointment as soon as possible . . . we are at the mercy of the community to get our patients seen timely." *Id.* at ¶8. Neither Defendant subsequently had any involvement in Mr. Molina's care or any related grievances. *Id.* at ¶ 8. Mr. Roberts' and Mr. Pierson's only involvement was to respond to Mr. Molina's two grievances, filed in March and June of 2017. *Id.*

On June 14, 2017, Dr. Simpson saw Mr. Molina again to ensure that his condition was not becoming more severe, and to re-assess his diagnosis. *Id.* at ¶ 9. At that visit, Dr. Simpson noted no pain and measured Plaintiff's eye pressure as 12 in both eyes. *Id.* Dr. Anderson then conducted a pre-surgical consultation with Mr. Molina on August 14,

2017. *Id.* Dr. Anderson confirmed that a cataract extraction procedure on Mr. Molina's right eye was appropriate, noted no eye pain, measured normal eye pressure, and suggested for the first time that Mr. Molina had a milder cataract in his left eye. *Id*. Dr. Anderson measured Mr. Molina's vision in his left eye as 20/40. *Id*. Dr. Anderson suggested that a second cataract extraction procedure could be performed on Plaintiff's left eye sometime after he recovered from the procedure on his right eye. *Id*. Dr. Anderson performed a cataract extraction on Mr. Molina's right eye on October 14, 2017, the earliest available date following the August 14 evaluation. *Id.* at ¶ 11.

In June 2018, Dr. Oliver Mullins tested Mr. Molina's vision in his right eye as 20/20-2, or nearly normal, and 20/63 in his left eye, with normal eye pressure in each. *Id.* at ¶ 12. A cataract extraction was performed on Mr. Molina's left eye just a month later, in July of 2018. *Id.* Mr. Molina has since stated that his vision is "very good" and that he has no complaints. *Id.* at ¶ 13.

## LEGAL STANDARD

1. **Summary Judgment Standard**

Summary judgment is appropriate where a party can show that, as to any claim or defense, "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). One of the principal purposes of the summary judgment "is to isolate and dispose of factually unsupported claims...." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986). It is "not a disfavored procedural shortcut," but is instead the "principal tool[ ] by which factually insufficient claims or

defenses [can] be isolated and prevented from going to trial with the attendant unwarranted consumption of public and private resources." *Id*. at 327, "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). There must be a genuine dispute as to any material fact—a fact "that may affect the outcome of the case." *Id*. at 248.

The evidence must be viewed in the light most favorable to the non-moving party, and the Court must not make credibility findings. *Id*. at 255. Direct testimony of the non-movant must be believed, however implausible. *Leslie v. Grupo ICA*, 198 F.3d 1152, 1159 (9th Cir. 1999). On the other hand, the Court is not required to adopt unreasonable inferences from circumstantial evidence. *McLaughlin v. Liu*, 849 F.2d 1205, 1208 (9th Cir. 1988). The Court must be "guided by the substantive evidentiary standards that apply to the case." *Liberty Lobby*, 477 U.S. at 255. If a claim requires clear and convincing evidence, the question on summary judgment is whether a reasonable jury could conclude that clear and convincing evidence supports the claim. *Id*.

The moving party bears the initial burden of demonstrating the absence of a genuine dispute as to material facts. *Devereaux v. Abbey*, 263 F.3d 1070, 1076 (9th Cir. 2001)(en banc). To carry this burden, the moving party need not introduce any affirmative evidence (such as affidavits or deposition excerpts) but may simply point out the absence of evidence to support the nonmoving party's case. *Fairbank v. Wunderman Cato Johnson*, 212 F.3d 528, 532 (9th Cir. 2000).

This shifts the burden to the non-moving party to produce evidence sufficient to support a jury verdict in her favor. *Deveraux*, 263 F.3d at 1076. The non-moving party must go beyond the pleadings and show "by her [ ] affidavits, or by the depositions, answers to interrogatories, or admissions on file" that a genuine dispute of material fact exists. *Celotex*, 477 U.S. at 324.

However, the Court is "not required to comb through the record to find some reason to deny a motion for summary judgment." *Carmen v. San Francisco Unified Sch. Dist.*, 237 F.3d 1026, 1029 (9th Cir. 2001) (quotation omitted). Instead, the "party opposing summary judgment must direct [the Court's] attention to specific triable facts." *Southern California Gas Co. v. City of Santa Ana*, 336 F.3d 885, 889 (9th Cir. 2003).

### 2. Eighth Amendment Legal Standards

Inmates rely on prison authorities to treat their medical needs, and the Eighth Amendment protects prisoners against cruel and unusual punishment. *Estelle v. Gamble*, 429 U.S. 97, 103 (1976). To state a claim under the Eighth Amendment, a prisoner must show that he is "incarcerated under conditions posing a substantial risk of serious harm," or that he has been deprived of "the minimal civilized measure of life's necessities" as a result of Defendants' actions. *Farmer v. Brennan*, 511 U.S. 825, 834, (1994). An Eighth Amendment claim requires a plaintiff to satisfy "both an objective standard – that the deprivation was serious enough to constitute cruel and unusual punishment – and a subjective standard – deliberate indifference." *Snow v. McDaniel*, 681 F.3d 978, 985 (9th Cir. 2012). The Eighth Amendment includes the right to adequate medical care in prison,

and prison officials or prison medical providers can be held liable if their "acts or omissions [were] sufficiently harmful to evidence deliberate indifference to serious medical needs." *Estelle v. Gamble*, 429 U.S. 97, 106 (1976).

Regarding the objective standard for prisoners' medical care claims, the Supreme Court has explained that "[b]ecause society does not expect that prisoners will have unqualified access to health care, deliberate indifference to medical needs amounts to an Eighth Amendment violation only if those needs are 'serious.'" *Hudson v. McMillian*, 503 U.S. 1, 9 (1992). The Ninth Circuit has defined a "serious medical need" as a "failure to treat a prisoner's condition [that] could result in further significant injury or the unnecessary and wanton infliction of pain [;] ... [t]he existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain ...." *McGuckin v. Smith*, 974 F.2d 1050, 1059–60 (9th Cir. 1992) (internal citations omitted), overruled on other grounds, *WMX Techs., Inc. v. Miller*, 104 F.3d 1133 (9th Cir. 1997) (en banc).

As to the subjective standard, a prison official or prison medical provider acts with "deliberate indifference ... only if the [prison official] knows of and disregards an excessive risk to inmate health and safety." *Gibson v. Cnty. of Washoe, Nev.*, 290 F.3d 1175, 1187 (9th Cir. 2002). "Under this standard, the prison official must not only 'be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists,' but that person 'must also draw the inference.'" *Toguchi v. Chung*, 391 F.3d

1051, 1057 (9th Cir. 2004) (quoting *Farmer*, 511 U.S. at 837). "If a [prison official] should have been aware of the risk, but was not, then the [official] has not violated the Eighth Amendment, no matter how severe the risk." *Gibson*, 290 F.3d at 1188 (citation omitted). However, "whether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence, ... and a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." *Farmer*, 511 U.S. at 842.

In the medical context, a conclusion that a defendant acted with deliberate indifference requires that the plaintiff show both "a purposeful act or failure to respond to a prisoner's pain or possible medical need and ... harm caused by the indifference." *Jett v. Penner*, 439 F.3d 1091, 1096 (9th Cir. 2006). Deliberate indifference can be "manifested by prison doctors in their response to the prisoner's needs or by prison guards in intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed." *Estelle*, 429 U.S. at 104–05 (footnotes omitted). Differences in judgment between an inmate and prison medical personnel regarding appropriate medical diagnosis and treatment are not enough to establish a deliberate indifference claim. *Sanchez v. Vild*, 891 F.2d 240, 242 (9th Cir. 1989). "[T]o prevail on a claim involving choices between alternative courses of treatment, a prisoner must show that the chosen course of treatment 'was medically unacceptable under the

circumstances,' and was chosen 'in conscious disregard of an excessive risk' to the prisoner's health." *Toguchi*, 391 F.3d at 1058.

Mere indifference, medical malpractice, or negligence will not support a cause of action under the Eighth Amendment. *Broughton v. Cutter Labs.*, 622 F.2d 458, 460 (9th Cir. 1980) (per curiam). Furthermore, a delay in treatment does not constitute a violation of the Eighth Amendment unless the delay causes further harm. *McGuckin*, 974 F.2d at 1060. If medical personnel have been "consistently responsive to [the inmate's] medical needs," and there has been no showing that the medical personnel had "subjective knowledge and conscious disregard of a substantial risk of serious injury," summary judgment is appropriate. *Toguchi*, 391 F.3d at 1061.

## ANALYSIS

1. **Mr. Molina-Ruiz's Eighth Amendment Claims**

    A. **Mr. Molina's Right Eye**

    Mr. Molina does not dispute the vast majority of facts presented in Defendants' Statement of Undisputed Facts (*see* Dkt. 24; Dkt. 22-2), and no material facts are in dispute. To survive summary judgement, there must be a genuine dispute as to any *material* fact—a fact "that may affect the outcome of the case." *Anderson*, 477 U.S. at 248 (emphasis added). Here, the question is whether the Defendants Pierson and Roberts responded to Mr. Molina's right eye medical requests with "deliberate indifference." *Toguchi*, 391 F.3d at 1061. Therefore, if Defendants were (a) "consistently responsive to [the inmate's] medical needs," and (b) there has been no showing that Defendants

"subjective knowledge and conscious disregard of a substantial risk of serious injury," then summary judgment in favor of Defendants is appropriate. *See Id.* The parties dispute whether Dr. Simpson recommended an emergency cataract procedure in March of 2017, which is immaterial to Mr. Molina's Eight Amendment claim against Defendants Pierson and Grant. Dkt. 24 at 1-2.

        *i.*      *Defendants Pierson and Grant Were Consistently Responsive*

First, the undisputed facts show that Defendants were "consistently responsive" to Mr. Molina's medical needs. Mr. Pierson and Mr. Roberts are "first-level" and "second-level" responders who field complaints or "grievances" made by inmates at ISCC. *Id.* Therefore, the extent of Defendants' involvement with Mr. Molina was to respond to the two grievances he filed in March and June of 2017. *Id.* The undisputed facts show Defendants are not, and never were personally involved with scheduling off-site appointments or other medical care and were fully responsive to both of Mr. Molina's grievances. Dkt. 22-2 at ¶ 7.

Mr. Molina's medical care began with a visit to Dr. Simpson on March 8, 2017. Dkt. 22-2 at ¶ 3. Dr. Simpson diagnosed Mr. Molina with a cataract in his right eye and mild diabetic retinopathy. Dkt. 22-4 at 21. For the mild diabetic retinopathy, Dr. Simpson indicated that Mr. Molina "require[d] no treatment." *Id*. For the cataract, Dr. Simpson's "impression" was that "[t]here would be no contraindications to proceed with cataract extraction from a retinal standpoint." Dkt. 22-2 at ¶ 3. Dr. Simpson also instructed Mr. Molina "to monitor his vision" and return "[i]f he notices any significant changes." *Id.*

Mr. Molina suggests that Defendants were unresponsive to Dr. Simpson's recommendation. Dkt. 3. While Dr. Simpson's language in his report isn't entirely clear, it cannot be said that Defendants were unresponsive. Regardless of Dr. Simpson's lack of clear recommendations, a follow up visit was scheduled for Mr. Molina on March 20, 2017. *Id.* ¶ 4. Mr. Molina failed to attend this follow up appointment. *Id.* Then, on March 24, 2017 (four days after his missed appointment), Mr. Molina filed a grievance. Dkt. 22-4 at 2. In his grievance, Mr. Molina broadly indicated that he was not "receiving adequate medical treatment for [his] eye . . .." *Id.*

Both Defendants timely responded to Mr. Molina's initial grievance by reiterating the next steps outlined by Dr. Simpson. For instance, Mr. Pierson explained that "[t]he plan of care moving forward will be discussed at your follow up appointment." Dkt. 22-4 at 2. And Mr. Roberts reminded Molina of Dr. Simpson's instructions to be cognizant of "any vision issues or changes." *Id.* After their response to Mr. Molina's March grievance, Mr. Molina was scheduled for another follow-up visit with Dr. Simpson on April 13, 2017. Dkt. 22-2 at ¶ 4. But again, Mr. Molina missed his follow-up appointment, which delayed his care even further. *Id.* Up to this point, Defendants were fully responsive to Mr. Molina's grievances about improper care, reiterating Dr. Simpson's impressions and plans for medical treatment.

Then, even though Mr. Molina failed to keep his follow-up appointments, Mr. Roberts informally spoke to Rona Siegert, the Health Services Director at ISCC, regarding Mr. Molina's treatment. *Id.* at ¶ 6. After their discussion, Ms. Siegert initiated

the approval process for the cataract procedure, a consultation request was submitted on April 25, 2017, and an off-sight pre-surgical evaluation with Dr. Lawrence Anderson was scheduled for August 14, 2017. *Id.* at ¶¶ 6-7. Significantly, the approximately four-month delay for pre-surgical evaluation was beyond Defendants' control because Defendants were not personally involved with off-sight scheduling, and Defendants have no control over off-sight provider availability. *Id.* at ¶ 7-8. Here again, there is no evidence to suggest that the Defendants were in any way unresponsive to Mr. Molina's requests.

On June 6, 2017, Molina filed another grievance to which Defendants timely responded. Dkt. 22-4 at 33. Mr. Molina accused Defendants of being engaged in a "den[ying] and or delay[ing]" his cataract surgery. *Id.* Mr. Pierson responded by reminding Mr. Molina of his missed appointments with Dr. Simpson and reassuring Mr. Molina that he was indeed scheduled to be seen and that ISCC is "at the mercy of the community to get our patience [sic] seen timely." *Id.* The third-level responder, Ms. Siegert, confirmed with ISCC medical staff and reassured Molina that he was "scheduled for surgery." *Id.*

In sum, there is no evidence to support Mr. Molina's claim that Defendants were unresponsive to his March and June 2017 grievances. Mr. Molina secured precisely the relief he requested in both grievances, Defendants were "consistently responsive to [Mr. Molina's] medical needs," and simply responded according to Dr. Simpson's less-than-clear instructions. *See Toguchi*, 391 F.3d at 1061.

*(a) Knowledge and Disregard of Substantial Risk of Serious Injury*

Second, there is no evidence to support Mr. Molina's claim that Defendants had a "subjective knowledge and conscious disregard of a substantial risk of serious injury." *Id.* Defendants only act with "deliberate indifference" if they knew of and disregarded an excessive risk to Mr. Molina's health and safety. *Gibson,* 290 F.3d at 1187. Here, there is no evidence to suggest that Mr. Molina's condition posed a substantial risk to his health or safety, or that Defendants knew of any risk of harm. Nothing in the medical records available to Defendants indicated that the cataract extraction procedure was an emergency or posed a substantial risk to Mr. Molina's health. *See* Dkt. 22-4. In fact, Mr. Molina denied having any pain when he reported his vision problems. Dkt. 22-2 at ¶ 2-3. The same was true during his visit with Dr. Simpson. *Id.* All the way up to August 2017, during his pre-surgical evaluation with Dr. Anderson, Mr. Molina reported no pain and had normal eye pressure. *Id.* at ¶ 10. Only once, in March 3, 2017 did Mr. Molina report any discomfort with his eye, but again, he denied "any significant pain." Dkt. 22-4 at 14. Had there been any emergency or risk to Mr. Molina, Dr. Simpson's records did not indicate as much, and Defendants had no contrary information from Mr. Molina. Dkt. 22-2 at 3. Mr. Molina does not dispute that before the surgery on his right eye, his residual vision was good enough to perform daily living activities. *Id.* at ¶10. Also, there is no evidence indicating Mr. Molina has suffered any ill-effects. There is no dispute that Mr. Molina's vision is now "very good." Dkt. 22-2 ¶ 13. And even if Mr. Molina was facing an emergency condition, he delayed medical attention by missing multiple follow-up appointments. Dkt. 22-2 at ¶ 4.

Thus, there is no evidence to support a claim that Mr. Molina's condition posed a substantial risk to his health or safety, or that Defendants knew of any substantial risk of harm and failed to act. Because the Defendants were responsive to Mr. Molina's medical needs, and because no genuine issue of fact has been raised regarding Defendants' "subjective knowledge of conscious disregard of a substantial risk of serious injury" to Mr. Molina's right eye, the Court will grant summary judgement on that claim in favor of Defendants. *See Toguchi*, 391 F.3d at 1061.

### 1. Mr. Molina's Left Eye

It is unclear whether Mr. Molina extends his Eighth Amendment claim to the medical treatment he received for his left eye. *See* Dkt. 3. In case he does, the Court notes that Mr. Molina has failed to exhaust the grievance process for any issues with his left eye.

It is a mandatory for inmates to exhaust their available administrative remedies before bringing civil rights actions. 42 U.S.C. § 1997e(a); *see also Jones v. Bock*, 549 U.S. 199, 211 (2007). An inmate has properly exhausted all available remedies when the inmate has "used all steps that the [prison] holds out, and doing so properly so that the [prison] addresses the issues on the merits." *Woodford v. Ngo*, 548 U.S. 81, 90 (2006). Proper exhaustion demands completion of the prison's administrative review process, including all levels thereof, in accordance with the deadlines and other critical procedural rules before filing a lawsuit. *Jones*, 549 U.S. at 204, 208. The Ninth Circuit has held that

claims for which administrative remedies were not exhausted must be dismissed. *See McKinney v. Carey*, 311 F.3d 1198, 1199-1200 (9th Cir. 2002).

Here, Mr. Molina failed to properly exhaust his administrative remedies with respect to his left eye. Defendants were first and second level responders tasked with responding to Mr. Molina's grievances. Dkt. 22-2 at ¶¶ 6, 8. In both of Mr. Molina's grievances he specifically mentioned loss of sight with his "right eye" and sought cataract surgery for that eye alone. Dkt. 22-4 at 2. While he mentions his left eye in passing, the primary subject in both of his grievances (at all levels of the grievance process) was the cataract surgery for his right eye. *Id.* at 2-4, 33-34. Indeed, Mr. Molina's complaint alleges that he needed "emergency surgery [on his] *right eye*" and that this particular surgery (or lack thereof) was the subject of his March, 2017 grievance and appeal. Dkt. 3 at 2 (emphasis added). In his response brief, Mr. Molina also reiterates that the subject of his claims against Defendants is that they "ignored a valid doctor's recommendation for cataract surgery." Dkt. 24 at 2. The cataract in Mr. Molina's left eye was not even diagnosed until August 14, 2017 and he did not submit any grievances thereafter. Dkt. 22-2 at 5.

Since Mr. Molina has failed to exhaust the grievance process for his left eye as required by 42 U.S.C. § 1997e(a), to the extent Mr. Molina brings an Eighth Amendment claim with respect to his left eye, the Court will grant summary judgment in favor of Defendants on this claim as well.

2. **Mr. Molina's State Law Claims**

In its Initial Review Order, this Court permitted Mr. Molina to pursue claims of professional negligence or malpractice against the Defendants. Dkt. 14 at 11. For the reasons that follow, the Court will grant summary judgement in favor of Defendants on each of these state law claims.

### A. Mr. Molina's Negligence Claims

Mr. Molina's negligence claims lack factual support. It is unclear from Mr. Molina's complaint whether he is claiming professional negligence or common law negligence. *See* Dkt. 3. The Court will therefore consider whether either negligence claim survives Defendants' motion for summary judgement.

In Idaho, "professional malpractice" is defined as "wrongful acts or omissions in the performance of professional services by any person, firm, association, entity or corporation licensed to perform such services under Idaho law." I.C. § 5–219(4); *see also Wyman v. Eck*, 161 Idaho 723, 390 P.3d 449 (2017). To state a claim a for professional negligence, a plaintiff must provide adequate factual allegations showing that the defendant owed a duty to the plaintiff, that the duty was breached, and that the breach caused damages. *Estate of Becker v. Callahan*, 140 Idaho 522, 525-26 (2004). The existence of a duty is a legal question. *Id*. On review, the Court has found no case law recognizing a duty on the part of prison administrators, owed to prison inmates, to review and respond to inmate grievances in a particular way. To the extent that Mr. Molina is claiming a duty under common law negligence, "[e]very person has a duty to exercise

ordinary care to prevent unreasonable, foreseeable risks of harm to others." *Nation v. State, Dep't of Correction*, 144 Idaho 177, 190 (2007).

Here, Mr. Molina has failed to provide factual support that Defendants were negligent as first and second level responders. Even if Defendants owed a duty to Molina to review and respond to first and second level grievances in a particular way, there is no evidence to support an assertion that Defendants breached the duty of ordinary care. Rather, Mr. Molina missed several follow up appointments with Dr. Simpson which created the delay which is the main subject of his grievances. Dkt. 22-2 ¶ 4. If Mr. Molina had simply attended his follow up appointments, any question of whether cataract surgery was emergent or whether such a procedure was actually recommended would have been resolved. Thus, any delay in treatment that Mr. Molina may have experienced was unrelated to Defendants' behavior.

In addition, Defendants evaluated Molina's grievances in a timely and appropriate manner in light of Dr. Simpson's report. Dkt. 22-2 at ¶ 5-8. Indeed, they echoed Dr. Simpson's recommendation that Mr. Molina should "monitor his vision" and return if he noticed "significant changes." *Id.* at ¶3. And after Molina filed his grievances, the second level responder, Mr. Roberts, initiated the consultation request for cataract surgery as requested. *Id.* at ¶ 6. Any subsequent delay or harm Molina incurred after the consultation request would not constitute a breach by the Defendants, because they are not involved in the scheduling of off-sight medical care, nor can they control the availability of an off-sight medical provider. Dkt. 22-2 at ¶ 8. In light of Mr. Molina's missed appointments

and the lack of clarity in Dr. Simpson's report, there is no evidence to support a claim that Defendants breached a duty owed to Molina, and therefore an absence of evidence to support Mr. Molina's claims of negligence. *See Celotex,* 477 U.S. at 324. For the foregoing reasons, the Court will grant summary judgment in favor of Defendants on Mr. Molina's negligence claims.

B.  *Medical Malpractice*

The Court will also grant summary judgment in favor of Defendants on Mr. Molina's medical malpractice claims for two reasons. First, Defendants were not responsible for providing medical care to Mr. Molina; and second, Mr. Molina has failed to follow Idaho's requirements for bringing a medical malpractice claim.

First, neither Defendant provided health care to Mr. Molina and neither evaluated him as a medical provider. *See* Dkt. 22-2 at ¶¶ 2, 3, 10. It is undisputed that Mr. Molina received medical care from Colin Brown, P.A., Dr. Scott Simpson, and Dr. Lawrence Andrews. *Id.* The extent of Defendants' involvement in Molina's care was to review and respond to his grievances. *See id*. Defendants cannot be liable for providing inadequate medical care when neither ever provided care to Mr. Molina.

Furthermore, Mr. Molina failed to meet the legal prerequisites for filing a medical malpractice claim in Idaho. "To avoid summary judgment in a medical malpractice action a plaintiff must also provide expert testimony that the defendant doctor, or other health care provider, negligently failed to meet the applicable standard of health care practice." *Hall v. Rocky Mountain Emergency Physicians, LLC*, 155 Idaho 322, 312 P.3d 313, 316

(Idaho 2013); *See also* I.C. §§ 6-1012 – 1013. Because Mr. Molina has failed to come forward with any with any such evidence the Court will grant summary judgment in favor of Defendants on Mr. Molina's malpractice claim.

## ORDER

In accordance with the Memorandum Decision set forth above, NOW THEREFORE IT IS HEREBY ORDERED, that:

1. Plaintiff's Motion for Summary Judgment (Dkt. 22) is **GRANTED**.

DATED: April 16, 2019

_____
B. Lynn Winmill
U.S. District Court Judge